## S10A1137. BENBOW v. THE STATE.
(702 SE2d 180)

HINES, Justice.

Marcus Maurice Benbow appeals his convictions for malice murder, burglary, armed robbery, aggravated assault, false imprisonment, and possession of firearms during the commission of felonies, all in connection with the death of Corey Walker, and the armed robbery, aggravated assault, and false imprisonment of Rico Smith, Jeffrey Eason, Chalandria McClouden, James Williams, and Twala Williams. For the reasons that follow, we affirm in part and reverse in part.[1]

In his sole enumeration of error, Benbow contends that the evidence introduced at trial was insufficient to support his convictions.

When evaluating the sufficiency of evidence, the proper standard for review is whether a rational trier of fact could

---

[1] The crimes occurred on October 14, 2006. On December 11, 2006, a Bulloch County grand jury indicted Benbow, along with Bryan Lazarous Hughley, Fredrico Shenard Mikell, and Kendall Jerell Worthy for: Count 1 – malice murder; Count 2 – felony murder during the commission of the felonies of armed robbery, burglary, and aggravated assault; Count 3 – burglary; Counts 4-9 – the armed robberies of Corey Walker, Rico Smith, Jeffrey Eason, Chalandria McClouden, James Williams, and Twala Williams; Counts 10-15 – the aggravated assaults of Corey Walker, Rico Smith, Jeffrey Eason, Chalandria McClouden, James Williams, and Twala Williams; Counts 16-21 – the false imprisonments of Corey Walker, Rico Smith, Jeffrey Eason, Chalandria McClouden, James Williams, and Twala Williams; and Counts 22-23 – possession of firearms during the commission of the crimes of armed robbery, burglary, and aggravated assault. In a separate count, Benbow was also charged with possession of a firearm by a convicted felon. Benbow was tried alone before a jury September 19-21, 2007, and found guilty of all charges except the armed robberies of Jeffrey Eason and Chalandria McClouden, as to which the court entered orders of nolle prosequi, and the charge of possession of a firearm by a convicted felon, which was not presented to the jury. On September 21, 2007, the trial court sentenced Benbow to a term of life in prison for malice murder, and additional terms of: 20 years in prison for burglary; life in prison for each of the armed robberies of Rico Smith, James Williams, and Twala Williams; 20 years in prison for each of the aggravated assaults of Rico Smith, Jeffrey Eason, Chalandria McClouden, James Williams, and Twala Williams; ten years in prison for each of the crimes of false imprisonment; and five years in prison for each of the crimes of possession of a firearm during the commission of a crime, all such sentences to be served consecutively to the term for malice murder and to each other. The conviction for felony murder stood vacated by operation of law and the charges of armed robbery of Corey Walker and aggravated assault of Corey Walker merged with the conviction for malice murder. *Malcolm v. State,* 263 Ga. 369, 372-374 (4), (5) (434 SE2d 479) (1993). On October 15, 2007, Benbow filed a motion for a new trial, which was denied on November 24, 2009. Benbow filed a notice of appeal on December 22, 2009, his appeal was docketed in the April 2010 term of this Court, and submitted for decision on the briefs.

have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence. [Cits.]

*Mickens v. State,* 277 Ga. 627, 627-628 (593 SE2d 350) (2004).

Kendall Worthy entered into a plea agreement with the State regarding his involvement in the crimes for which Benbow was convicted. Worthy testified that: he and Benbow, together with Fredrico Mikell, traveled from Waycross to Statesboro in a car driven by Bryan Hughley; before they left Waycross, an AK-47 assault rifle was placed in the trunk of the car; during the drive, Mikell tried to reach various drug dealers by telephone; Benbow told Mikell to tell anyone he reached that they had $3,500 to spend on drugs; the men learned that a drug dealer was in a gambling house in Statesboro; when they reached the gambling house, Mikell left the car; on returning, Mikell said that the drug dealer did not have sufficient drugs available; Benbow stated, "[w]e fixing to get something" and "[w]e didn't come down for nothing"; Benbow was seated in the car's backseat and slid along the seat so that the seat back could be dropped so as to access the trunk; Mikell retrieved the AK-47 from the trunk; Benbow got the ammunition clip for the rifle from the trunk and handed it to Mikell; Benbow took a .22 caliber pistol from under the front passenger seat; Mikell and Benbow exited the car and approached the door of the gambling house; Mikell knocked on the door and then ran, dropping the AK-47; when the door opened, Benbow placed his pistol inside the door, and struggled with the man who opened the door; Worthy exited the car and picked up the AK-47; as he approached the door, he heard a shot and Worthy fired multiple rounds from the AK-47 into the house as he backed away; Benbow collected money from the floor of the house and returned to the car; Hughley drove the car, with Benbow and Worthy as passengers, back to Waycross; after their arrests, Benbow told Worthy not to take a plea agreement, but urged him to get relatives or friends "to come testify saying [Worthy] was home with them and stuff like that"; while Worthy was confined before Benbow's trial, he was given a letter from Benbow to Benbow's son, who was also confined, stating that Worthy should not testify against Benbow as Benbow had "kept it real" regarding Worthy.

Surviving victims testified that: a dice game was going on in the house; the players had placed their money on the floor of the front room; Mikell knocked on the door; Walker spoke with him outside

the house; upon his return inside, Walker stated that Mikell wanted to spend a large amount of money; sometime later, there was another knock on the door; James Williams answered the door and a pistol was inserted through the door opening; Williams struggled with the man at the door; and many shots were fired either by the person who had struggled with Williams at the door or another man. Testimony of the medical examiner established that Walker died of two gunshot wounds to the torso.

Benbow notes that, according to Worthy's testimony, Worthy and Benbow were accomplices, and that the testimony of an accomplice must be corroborated to sustain a conviction.

> [T]o sustain a conviction in a felony case upon the testimony of an accomplice, there must be corroborating facts or circumstances, which, in themselves and independently of the testimony of the accomplice, directly connect the defendant with the crime, or lead to the inference that (he) is guilty. . . . [Cit.] See also OCGA § 24-4-8. The necessary corroborating evidence may be circumstantial and it may be slight. [Cits.] The sufficiency of any corroborating evidence is for the trier of fact to decide. [Cit.]

*Matthews v. State*, 284 Ga. 819, 819-820 (1) (672 SE2d 633) (2009). It is not necessary that the corroborating evidence correspond to the accomplice's testimony in every particular. *Bush v. State*, 267 Ga. 877, 878-879 (485 SE2d 466) (1997). There was ample evidence corroborating Worthy's version of events, including that, at trial, Twala Williams identified Benbow as the man who came into the house and removed the money from the floor of the front room, and McClouden testified that Benbow was the man who struggled with James Williams at the front door.

Benbow presented the testimony of both his brother and the woman who was Benbow's girlfriend at the time of his trial that, at the time of the crimes, he was at his brother's residence in Waycross and not in Statesboro. Although he contends that this testimony renders the evidence against him insufficient, this is not so; such testimony only created a conflict in the evidence, and the credit to be given to an alibi witness is for the jury's determination. *Mickens*, supra at 629; *McCoy v. State*, 273 Ga. 568, 569 (1) (544 SE2d 709) (2001).

Although Benbow does not specifically argue the sufficiency of the evidence as to the false imprisonment charges, the indictment set forth six counts of that crime, alleging that he "did confine" each of

the six persons inside the house, thus violating OCGA § 16-5-41.[2] However, there was no evidence that Benbow, or any accomplice, performed any act that could be considered to have "confined" the victims, as that term is commonly understood, see *Alexander v. State*, 279 Ga. 683, 686 (3) (620 SE2d 792) (2005), or otherwise "arrest[ed]" or "detain[ed]" them as set forth in OCGA § 16-5-41 (a).[3] Accordingly, the judgments of conviction for the six counts of false imprisonment must be reversed.

The evidence was sufficient to enable a rational trier of fact to find Benbow guilty beyond a reasonable doubt of all other crimes of which he was convicted. *Jackson v. Virginia*, supra.

*Judgments affirmed in part and reversed in part. All the Justices concur.*

DECIDED NOVEMBER 8, 2010.

*Gabriel T. Cliett*, for appellant.

*Richard A. Mallard, District Attorney, Daphne H. Jarriel, Assistant District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Sheila E. Gallow, Assistant Attorney General*, for appellee.

---

[2] OCGA § 16-5-41 reads:

(a) A person commits the offense of false imprisonment when, in violation of the personal liberty of another, he arrests, confines, or detains such person without legal authority.

(b) A person convicted of the offense of false imprisonment shall be punished by imprisonment for not less than one nor more than ten years.

(c) Any person convicted under this Code section wherein the victim is not the child of the defendant and the victim is less than 14 years of age shall, in addition, be subject to the sentencing and punishment provisions of Code Section 17-10-6.2.

[3] Eason testified that when the struggle at the door began, he ran into a bedroom, and then into the bedroom closet. Smith testified that he ran into that bedroom, found he could not exit through the window, and Eason called him to come into the closet, where the two men stayed in fear until after the gunshots ceased. However, such does not constitute false imprisonment on Benbow's part. See *Lopez v. State*, 260 Ga. App. 713, 714 (1) (580 SE2d 668) (2003) ("Absent the element of holding the victims against their will, there is no crime of false imprisonment . . . .")