## S12A1742. HAYES v. THE STATE.
(739 SE2d 313)

HINES, Justice.

Joanna Hayes appeals her convictions and sentences for malice murder and possession of a firearm during the commission of a felony, which were in connection with the shooting death of her former daughter-in-law, Heather Strube ("Heather"). For the reasons that follow, we affirm.[1]

In her sole enumeration of error, Hayes contends that the evidence was insufficient to support her convictions.

> When evaluating the sufficiency of evidence, the proper standard for review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence. [Cits.]

*Mickens v. State*, 277 Ga. 627, 627-628 (593 SE2d 350) (2004).

The evidence presented at trial showed that Heather and Hayes's son, Steven Strube, Jr., ("Strube") were married in 2004. In September 2007, Heather bore a son, Carson. However, the marriage deteriorated and ended in divorce, with the parents sharing custody of Carson. It was customary for Carson to be transferred from one parent to another in a certain shopping center parking lot in Gwinnett County. On Sunday, at about 5:30 p.m., April 26, 2009, Strube drove from the home he shared with Carson, Hayes, and Hayes's husband; Hayes had left some minutes before. Carson was with Strube, and they arrived at the shopping center shortly before 6:00

---

[1] The crimes occurred on April 26, 2009. On October 21, 2009, a Gwinnett County grand jury indicted Hayes for malice murder, felony murder while in the commission of aggravated assault, aggravated assault, and possession of a firearm during the commission of a felony. Hayes was tried before a jury May 2-18, 2011, and found guilty of all charges. On May 27, 2011, Hayes was sentenced to life in prison for malice murder, and a consecutive term of five years in prison for possession of a firearm during the commission of a felony, which could be served on probation; the remaining counts merged with the malice murder or were vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4), (5) (434 SE2d 479) (1993). Hayes moved for a new trial on June 9, 2011, and amended her motion on April 16, 2012; the motion as amended was denied on May 3, 2012. On June 1, 2012, Hayes filed a notice of appeal to the Court of Appeals; that court transferred the appeal to this Court in which it was docketed for the September 2012 term, and submitted for decision on the briefs.

p.m. and parked; several witnesses were in the area. Shortly thereafter, Heather arrived in another vehicle and parked nearby; a person wearing a dark wig and false mustache lingered in the area, separated by other vehicles from Heather's vehicle. Heather placed Carson in a child's car seat in the rear of her vehicle, Strube drove away, and the person wearing the wig and mustache walked briskly to Heather. Heather, with a surprised expression, looked at the person wearing the wig and mustache, they spoke briefly, and Heather, backing away, attempted to open the driver's door of her vehicle, but the other person closed it. Heather uttered "help" to a passing motorist, and the person wearing the wig and mustache produced a handgun from a black messenger bag, quickly put the weapon to Heather's forehead, fatally shot her, and walked into a nearby store.

Several eyewitnesses initially described the shooter as a man, but one, working with a sketch artist, realized that the shooter was, in fact, a woman. Another eyewitness identified Hayes as the shooter from a lineup, but categorized her certainty level as between 0% and 25%. Yet another eyewitness testified that, when Hayes was arrested and appeared on television, she recognized her as the shooter from Hayes's manner of walking, posture, shoulders, complexion, and nose. And, a friend of Heather's who had not witnessed the shooting testified that, when she viewed surveillance video taken of the parking lot during the shooting, she recognized Hayes from her distinctive walk that she described as "stiff legged" and with a "very wide stride."

The day before the shooting, Myers, who was staying at a hotel adjacent to the parking lot, was outside the hotel smoking and noticed a white Ford F-150 pickup truck with an extended cab. The next day, "between 5:00 and 7:00-ish [p.m.]," Myers saw the same truck, with a suspicious looking person seated behind the steering wheel; the person was wearing a wig and mustache, and, upon realizing that Myers was watching, quickly drove the truck away, squealing the tires. Two days later, after he contacted investigating law enforcement personnel, investigators drove Myers along the street on which Hayes lived, and he identified her pickup truck as the one he had seen in the parking lot.

Hayes told an investigating law enforcement officer that on the day of the shooting, she drove her pickup truck from her home between 5:15 p.m. and 5:30 p.m. to visit her parents, who lived some distance away; she said that close to her destination, in Newnan, she stopped to purchase a drink and the receipt was in the truck. Hayes also told the investigator that Heather was not a good parent, had inherited poor parenting skills from her own mother, and was not a

"good parent morally and wasn't good enough to raise her grandchild." She also stated that she knew where Heather and Strube would exchange custody of Carson. A dark fiber was found inside the truck which was of a type that might be used in a wig. The receipt found in Hayes's truck showed a purchase at 7:19 p.m. the day of the shooting. On a subsequent Sunday, law enforcement personnel drove from the scene of the shooting to the restaurant shown on the receipt, leaving at 6:00 p.m. and driving the speed limit; they arrived at the restaurant one hour and twenty minutes later.

The year before the shooting, on February 14, 2008, Hayes and another person, Pinzino, spent nine hours together while delivering flowers. During the course of the day, they engaged in a conversation in which Hayes described her thoughts on how to commit a murder and "get away with it." Hayes noted that an alibi could be established by using a credit card at the correct time, but at a place distant from the crime scene, or perhaps having a family member use her card to purchase something for her; only a family member should be used for such a task, she said. She related that she could buy a handgun from a casual laborer at one of the construction sites at which she worked, and then destroy it using a grinder or plasma torch, throwing the remains into a lake; Pinzino knew that Hayes had access to grinders and a plasma torch at her home workshop. Hayes also said she would not use her minivan to commit the crime, as it was a distinctive color, or her Dodge pickup truck, as it had a large dent in the rear, both vehicles thus being notable to any witnesses; Pinzino knew that at the time, Hayes also owned a white pickup truck. Pinzino also knew that Hayes preferred a revolver to a semiautomatic handgun.

In jail, while awaiting trial, Hayes told a fellow prisoner that she believed that Heather was a bad mother with no mothering skills, and that it made Hayes "sick" to think of Heather with Carson; Hayes also told this inmate that she killed Heather by shooting her in "the front of her head." Hayes asked another inmate if she had heard about the shooting of Heather and said "that's why" she was incarcerated; Hayes did not deny to this inmate that she was the shooter. Hayes also told this inmate that Heather was going to try to keep sole custody of Carson, that this would "tear the family apart," that such was "against God's way of the family," and now that Heather was dead "they could be a family."

Testimony was also given that, in 1991, while going through a divorce with Steven Strube, Sr., Hayes took a .38 Rossi revolver she owned and placed the muzzle against his forehead; at that time, she carried this weapon virtually every day. Ballistic evidence showed that Heather had probably been shot with either a Rossi or Taurus .38 revolver, but no such weapon was ever found.

Hayes contends that various witnesses for the State were influenced by news coverage of the crimes and of Hayes's arrest, that the images captured by surveillance cameras were of insufficient quality to allow any identification of Hayes as the shooter, and that the witnesses who testified about Hayes's statements while awaiting trial were unreliable. She asserts that the State presented only circumstantial evidence that did not exclude all reasonable hypotheses except that of her guilt. See OCGA § 24-4-6.

> [Q]uestions as to the reasonableness of hypotheses are generally to be decided by the jury which heard the evidence and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law. [Cit.]

*Robbins v. State*, 269 Ga. 500, 501 (1) (499 SE2d 323) (1998). Further, it is for the jury to resolve conflicts in the evidence and questions of witness credibility, not this Court. *Tolbert v. State*, 282 Ga. 254, 256 (1) (647 SE2d 555) (2007). The issues Hayes raises go to the weight of the evidence, and, properly viewed, the evidence authorized the jury to find Hayes guilty beyond a reasonable doubt of the crimes for which she was convicted. *Jackson*, supra; *Mickens*, supra.

*Judgments affirmed. All the Justices concur.*

DECIDED MARCH 4, 2013.

*Sharon L. Hopkins*, for appellant.

*Daniel J. Porter, District Attorney, Dan W. Mayfield, Assistant District Attorney, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Clint C. Malcolm, Assistant Attorney General*, for appellee.